Hi, Judge Ward-Lodge, Judge Callahan, and Judge Kleinfeld here. So we're advised that both counsel are here. Right. So this is the appeal. This is the oral argument on the appeal from the Order 9, Emergency Motion for Temporary Restraining Order or Preliminary Injunction. And we have reviewed the papers and the case law and have some questions that we wish to address to counsel. So I'll go ahead. My first question is to Mr. Bass. In your papers, the state represents that it plans to adhere strictly to the protocol. I guess that was modified on June 10, 2011? Yes. So is the state expressly representing to the court that you will be following the protocol and not be making the deviations that are argued by the public defender? Yes. The state is representing that it's going to follow the protocol as written. I will say that some of the alleged deviations that were made by Mr. West, as noted in the district court order, are not truly significant deviations at all. And I'm talking, for example, about the use of the femoral vein as a default access site and things like that. But as the protocol is written, yes, the state vows that it's going to adhere to it. We're at this point not asking about your opinion on significance. We're asking what you're actually going to do. You're going to follow the protocol and you have the drugs? Yes, Your Honor. And will you be using the protocol for either the use of sodium pentothal or pentobarbital? Which one will be used? I understand. Pentobarbital will be used, Your Honor. Now, is this the same drugs that were used for Mr. Beatty? Yes, it will be the same drugs that were used in two previous publicly witnessed executions in Arizona. Mr. West will be subject to the same protocol that has been used before. And what was the other one besides Mr. Beatty? Was it Mr. Bible? Yes, there was Mr. Bible a few weeks ago. And were there any observations as to severe pain or any demonstrated problems with the administration of the drug protocols in those two cases? No, Your Honor, there were not. Were both executions witnessed? Yes, sir, they were. I noticed, this is Judge Callahan, I noticed that Mr. West claims that the ADC used both sodium thiopentol and pentobarbital to carry out the execution of Eric King. And that that was raised in Mr. West's reply to the state's response. And it appears that it was, and pointed out, I believe that there was a doctor that made certain comments about Mr. King's execution. And I see in the government's brief that the statement that King was executed using sodium thiopentol. Yes, Your Honor. And that sodium thiopentol is known to metabolize into pentobarbital. And that would be the reason that both could be found in the, I guess, the autopsy? Right. Yes, we definitely want to refute the allegation that the ADC is not sure which drug it will use and that it might use sodium thiopentol, or say they're going to use sodium thiopentol but in reality use pentobarbital or vice versa. The state plans to use pentobarbital in this execution. And as we note with our reference to the toxicology text there that, as you state, Your Honor, apparently sodium thiopentol is known to metabolize into pentobarbital. So finding pentobarbital in an autopsy of someone who was executed with sodium thiopentol is not at all apparently unusual, and it certainly is no indication that pentobarbital was used instead of sodium thiopentol. Mr. Byke, I think Counsel for Mr. West, one of the things that I wanted to clarify, that in the government brief they're saying that previously in Dickens, that you previously recommended that the court use pentobarbital to carry out execution, and now Mr. West complains that the government should not use pentobarbital. Do you want to respond to that? Yes, Judge. This is Dale Bache with the Federal Defender's Office. When we litigated the Dickens matter, the discussion of pentobarbital was in the context of a one-drug rather than a three-drug protocol. What the state intends to use in the execution of Mr. West is a three-drug protocol, and as explained by the declaration of Dr. Wiesel that was submitted to the district court and to this court, there are problems with using pentobarbital in a three-drug regime. I guess what Dr. Wiesel was talking about, though he didn't witness, he described what he would say were some activity in two prior executions, and somehow this relates to the use of the drugs that Mr. West claims of how he's satisfying the Bayes standard here. I'm having difficulty connecting the dots here, because if it's correct that sodium thiopental was used on Mr. King, then how does that relate to what's going to be used with Mr. West, and how does that work to satisfy the standards that you have to show under Bayes? Well, first of all, with the King execution, the state is correct that thiopental does break down to pentobarbital, but in order for that to happen, there needs to be a working liver for the drug to metabolize, and in execution, the prisoners are dead within 10 minutes, and once the prisoner is dead, the metabolization stops. And what jumped out about the King execution is that the numbers, the level of pentobarbital that was listed in the toxicology report is much higher. It's off the charts, if you will, than in previous executions. So that's the concern that we have about the King execution, and I'd like to reference the citation that the state made to a 1988 abstract in its brief. That abstract was a study that was done on living humans who continue to circulate their blood, and as I said earlier, our clients are dead in a matter of minutes. So we have some real concerns about what happened in the King execution. Counsel, I have a question. You raised concerns, and it seems to me that this is a problem that the Supreme Court addressed in Bayes v. Reiss, and that in Bayes v. Reiss, the Supreme Court firmly placed the burden on the defense, not only to show that the state's method is inadequately tested or inadequately supported, but also to show that it amounts to the intentional or wanton infliction of unnecessary, severe pain. The way they say it is the stay of execution may not be granted upon grounds such as those asserted here unless the condemned prisoner establishes that the state's lethal injection protocol creates a demonstrated risk of severe pain. He must show that the risk is substantial when compared to the known and available alternatives. A state with lethal injection protocols substantially similar to the protocol we have polled today would not create a risk that meets this standard. My concern is two things. First of all, it sounds to me as though the protocol that's going to be used here is substantially similar, but more important, it seems to me that you have raised questions but not met the burden of providing answers to those questions, and the burden under Bayes is on the prisoner to provide the answers. I'd like to address the second question first. As Judge Callahan may remember, we were before the court a few months back in Beatty, and what's happening here is that the information, the problems with the protocol that we identify are coming to us in piecemeal fashion, and it's almost impossible under these circumstances to meet our burden, and that's why we're here asking for a state today. I have a few questions about that. Sure. First of all, the similarity of the things that do come to you piecemeal is such that I don't see why the response couldn't be basically prepared and canned in advance. I mean, we're talking about a barbiturate to sedate followed by a poison to kill in all these cases, and all the barbiturates operate on the GABA receptors in a very similar way. The second thing is I don't see why the questions you raise could not be addressed by prisoners on death row seeking a declaratory judgment and injunction. The death penalty cases I get are usually decades old. They have a long time on death row to raise questions and do discovery if necessary and consult medical experts and litigate. Well, as far as, you know, preparing a response in advance, I want to point out to the court that some of this information just came to our attention. For instance, the information about Eric King came to us on Saturday when we received his autopsy report. The information about the state deviating from its protocol during the practice sessions and, you know, being advised not to purchase the drugs from this overseas driving academy, that just came to us Thursday evening. The incidents in Georgia and Alabama are of very recent vintage. I have a question for you about the incidents in Georgia and Alabama. Do you know what kind of protocol was used there, whether it was just the pentobarbital or whether there was a two- or three-drug protocol used there in either one of those cases? Both Georgia and Alabama have a three-drug regime. I believe that only Ohio and Washington State are the two jurisdictions that use a one-drug protocol. This is Judge Callahan. From that standpoint, what is your position as to what the three drugs were that were used in Alabama and Georgia? Because the government has already said that the first drug was sodium thiopental, and so as opposed to being the same as this execution here. In Alabama, I believe the drug was pentobarbital that was used in as was the first drug used. It's been the same thing in Georgia, and the reason is that the sodium thiopental was seized from the various states by the DEA. I understood you to say that you believe that based on the autopsy and saying how it was metabolized, and the government saying on the other side they're saying, no, it was sodium thiopental. Are you determining what the first drug was by virtue of the medical evidence that you're making inferences from? Obviously, we don't know. We were not in the execution chamber. The state has not provided the execution logs, even though they have done it in the past. So we only know what we know, and based on the high level of pentobarbital in the tox report for Mr. King, that leads us to conclude that there was a mixture of sodium thiopental and pentobarbital. Now, we may be wrong, and I think a way to determine whether we're wrong is at a hearing rather than having the lawyers saying different things and having the court try to define what really happened. Now, on the Beatty and the Bible execution, the information that you have is that the three drugs are the same that they're saying they're going to use in terms of their protocol on Mr. West, correct? Yes. All right. I didn't see anything in the record, and I want to know if I'm missing anything in terms of was there any evidence presented that either of those executions that there was evidence that something had gone wrong or of pain? Well, it's hard to observe pain, but there- You did put in, though, but you put in in King and the other executions, the Alabama and the Georgia executions, physical indications of what you're asking us to infer was pain. Was there anything in either the Bible or the Beatty that you're asking us to make those same inferences? There were no witness accounts of twitching or any kind of movement. Mr. Bass, did you- It is frustrating. I can see your frustration at the inability to have a full evidentiary hearing on some of these things, but I'm just wondering, did you interview the witnesses at the prior two executions to find out whether anything was observable? I witnessed both executions. And did you see any observable signs indicating pain? I had some concern about Mr. Beatty's reaction to the pentobarbital. He took a number of deep breaths. It was hard for me to see because of the way that the execution chamber is set up. Mr. Beatty was covered with a sheet up to his chin, so I could not observe anything other than his face. Mr. Bible took, and I'm doing this from memory, I have notes, but I think about a minute and a half, minute 20 into the execution, took 16 rapid breaths. I don't know what that means, but- And again, this goes to part of the protocol. When we were litigating this in the Dickens case, we brought our concerns to the state. One is that we wanted to be able to observe the prisoner and see the lines where they went into the prisoner. And in all four executions, the prisoner was covered up to his chin. One of the big issues in the Dickens litigation was femoral access. That was our biggest concern. Prior to Landrigan, less than 1% of the executions in Arizona were conducted by femoral access. In fact, the state said during the Dickens litigation that we know how to do peripheral. Since the Dickens litigation, at least 75% or maybe 100% of the executions were done by femoral. Why is that? We don't know the answer to that. What is the significance of using femoral as opposed to peripheral? Does it obstruct your view, the public witness's view? Well, first, for the prisoner, it's highly invasive. A surgical procedure is performed near the groin. And a catheter is inserted with wires. And it is stitched over. And that is a lot different than inserting a catheter in the peripheral veins in the arms. That was our biggest concern in litigating Dickens. And every execution, or at least three out of four, were done in that way. When the state said, we won't do it, they did. I don't understand why this matters. The reason to use the femoral rather than the peripheral is that it's fatter, it's bigger. So they can be more confident of getting plenty of anesthetic effect faster. That's the only significance that I can think of. And I can't see why that would matter, especially considering the burden you have to bear under bays. It looks as though the switch in some institutions to femoral was just to assure anesthetization. Why don't we ask Dr. Bass? What is the reason there's been a switch to femoral? Well, I think Dr. Feinfeld said it best. I think that's the reason why the femoral artery is used or that access is used. According to the medical team leader, the doctor, whoever sees this, it's a better means of making sure the anesthetic is fully supplied and takes effect. That seems contrary to it, so it would hurt less. It seems contrary to the claim that it would cause severe pain. It seems that if you're doing something to get more anesthesia, that means that a person would suffer less. The stick hurts more when they spin, but you would have less pain once the barbiturate was injected. Isn't that right? Well, this is Dale Baysh. First, the state said they wouldn't do it, and they are doing it. I mean, that's a concern, and, again, it's a deviation from the protocol. It's activities like that that gave Judge Frost in the Cooey case out of the Southern District of Ohio some concern. If the state told us during the Dickens litigation that they wouldn't do the femoral and now they're doing femoral, what other changes are they doing that we don't know about? In addition, Arizona, I think, is the only state that does femoral access. When we litigated the Dickens litigation, we surveyed all of the states, and Arizona was the only one that was doing it that way. So the state said it wouldn't do it, and now it's doing it. And, again, that's another deviation from the protocol. We had an assurance from the state's attorney that they were following their protocol. May I address that, Your Honor? Yes, the state does avow that the protocol will be followed. I will say, as the district court notes, that the protocol states that femoral access is permissible if the medical team leader determines that it's not possible to place a reliable peripheral line. So to use the femoral vein is within the strictures of the protocol. Yes, but it does seem a little of concern that if you're doing all of them now femorally, that you're not following the protocol and that you're not attempting to go peripherally first and then only doing the femoral when a determination is made that the peripheral will not work.  I'm not sure. I can't say from my own personal knowledge whether the medical team leader is going directly to the femoral access or is attempting to use the peripheral line and then finding that that isn't working and then going to the peripheral line. Isn't that what the protocol demands? Well, the protocol demands that either can be used, but I think the... It's a priority that you use peripheral, and if that fails, then you can make a determination to use the femoral. Right. I'm sorry, but it does test that discretion with the medical team leader. Right, but it sounds like they're not making the decision in the right order. So it doesn't sound, I mean, you're avowing that the protocol be followed, but you're not giving at least me any confidence that, in fact, the medical team leader is actually making a determination that the peripheral won't work before he goes to the femoral, which is required by the protocol. Well, I understand, and when I say that I avow that the protocol will be followed, I mean that I avow that the discretion that the medical team leader has to make that call will be... or her choice is that they... That's how the execution will take place. Well, I guess the issue does... Is there anywhere in the protocol that requires that the peripheral has to be failed before the femoral can be attempted? Or does the protocol just say broadly that the medical person has the discretion to determine which to use? What exactly does the protocol say? My understanding is that there is discretion to decide which to use. I don't think that the doctor has to insert into the peripheral vein and try that a few times and then say, well, I don't think it's going to work, and then go to the femoral. Why don't you give me the paragraph on that requirement? Well, the citation I have is... I don't have it. Pardon me. I have the citation that's in the... This is Dale Bates. I have it. It's Attachment F, Department Order 710, Paragraph G1 that says... And I'll try to find it. It's Exhibit... and a backup femoral floor catheter in two separate locations in the peripheral vein utilizing appropriate medical procedures. The insertion sites, in order of preference, shall be, since mandatory, arms, hands, ankles, and feet, as determined medically appropriate by the medical team leader. And then, so it's mandatory to start with that peripheral. And then you go down to all the way to Paragraph 8, and it says, should it become necessary to use an alternative means of establishing an IV line because, in the opinion of the medical team leader, it is not possible to reliably place a peripheral line in the inmate, the medical team member may utilize the femoral vein. So this protocol clearly calls for peripheral, use of peripheral veins unless it becomes necessary. So he doesn't have equal discretion to choose from the outset. He has to try the peripheral first. And are you telling me that he's going to do that with Wes or not? I'm telling you, Your Honor, that he's going to follow the protocol. I'm looking at... You don't really understand what this protocol is, do you? I'm asking a very specific question. The protocol requires the peripheral veins to be tried first. Do you understand that? Yes, I do, Your Honor. And are you representing to this court that that will happen with Mr. Wes? I am representing that the team leader will follow the protocol. You are not answering my question. Well, I understand, Your Honor, but I'm... I'm very frustrated with that. I want to know whether, with Mr. Wes, the protocol that requires that the IV lines be inserted in the peripheral vein and the order of preference is arms, hands, ankles, and feet will be followed in this case. I want a representation one way or the other as to that fact. I don't want an abstract, generalized kind of, oh, yeah, we're going to follow it, because the whole problem that's being questioned here is that that's what the agency says every time and then something else happens. And, you know, for me, the biggest example of that is when, in Brewer v. Landrigan, the Supreme Court, citing the base standards, said there was no showing that the drug was unlawfully obtained, nor was there an operative proof to that effect. And we all know that in Brewer v. Landrigan, the drug was unlawfully obtained. We know that as a matter of historical fact. So I really think that it's time for the agency and counsel representing the agency to be factually accurate about following the protocol. So what's the answer to my question? Your Honor, the answer to your question is that the protocol will be followed, and if it calls for the catheter to be first inserted, definitely inserted, and I'm not sure to the degree that it does in every case, but if it is to be inserted first into a peripheral vein and that insertion must be made before the medical team leader can determine that it's not possible to proceed, then I would have vowed that that's how it's going to happen. I don't understand why it said if. Is that what it says, though? I mean, what if you look at someone's arm, feet, and you ascertain they have no veins? Do you have to stab them first? Or can someone experienced ascertain, well, this vein isn't good enough, so I'm going to go femoral? What is it? I guess the issue, I'm not hearing it exactly. I don't understand the if here, and I don't understand the precise issue. So G1 says, shall determine, cite, and insert a catheter and a backup catheter in two separate locations in the peripheral veins. Then as you go down, it says that the IV team should watch for the dark red flashback of blood at the catheter hub. That assures that you've got proper placement. And then they put in heparin and saline to keep it open. And then they say, should it become necessary to use an alternate means, because in the opinion of the medical team leader, it's not possible to reliably place a peripheral line in the inmate. A medical team member may utilize a percutaneous central line in the inmate's femoral vein. Now, I don't understand how that addresses sequence at all. Sometimes you can't find a vein in people just because their veins are difficult to find. It may be because of obesity. It may be because of repeated injections of narcotics. There can be all sorts of reasons that veins are hard to find. And I don't see why the protocol requires a particular sequence or why there's any if to this. It looks as though it says exactly what to do. This is Dale Beish, if I may respond. We know from the autopsy of Jeff Landrigan that there were no attempts made on his arms. Well, that doesn't mean that they didn't follow the protocol, though. I can't remember any of the details of that execution. But, gee, even when in ordinary medical circumstances, sometimes they have trouble hitting a vein. I guess just to clarify what I'm asking about, Mr. Dworak, the language in the first paragraph says, shall determine site and insert. So it doesn't seem to leave room for, you know, the ordinary, you know, doctor patient or nurse patient having their blood run and, you know, take out your arms and it says, you know, which veins are better and they start pressing around. It doesn't. It isn't that. It says shall determine site and insert. Shall certainly seems to modify both determine site and insert. Well, Your Honor, Jonathan Bass here. The only thing I'd say to that, why I still would maintain that there's a bit of discretion here, is although it does say, as you read, it does say the insertion sites in order of preference shall be, and then we go through various ones, two arms, two hands, two ankles, two feet. And I guess because there's a, it doesn't stop with arms or it doesn't stop with hands. I mean, it does give various body parts that the medical professional is going to examine in turn. And I read that to mean he starts with the arms and the hands, et cetera, ankles, feet, but he moves on because the arms may not be appropriate. The hands may not be appropriate, et cetera.  You must agree with this, that there's an order of preference as to where the catheters should be inserted, and femoral area is the last one. Yes, I do agree with that. Now, the problem is we don't have evidence in the record as to all of the prior executions that might tend to lead to an inference that you're not following this protocol. I mean, that's the very problem that I think the catch-22 that keeps being referred to over and over again. Well, I think I understand, Your Honor. And when I say earlier that I agree with you as far as the sequence of events, I agree. Frankly, I mean, in all good faith, I agree that the medical director can look at these body parts and make determinations and move in this order and then decide where it's going to be inserted. I don't read the protocol to mean that the arms first have to be pricked and then the hands and then the ankles and feet and so on, and that all these insertions have to be made into the body of the prisoner before the femoral artery can be accessed. The medical professional is going to make that determination looking at these body parts and then deciding where the best place is. But I would say that I don't – I understand how you're reading it, Your Honor, but even if we end up using the femoral access port there, it's still within the protocol. I mean, we're just talking about where the incision or the insertion will be, and it always has been and will be with Mr. West in a certain body part here, a certain part of his body that will be consistent with what the protocol calls for in the opinion of the medical professional. This is Dale Bache. I just find it a little hard to believe that in the first 20 lethal injections in Arizona, the state was always able to get a vein in the arm or the ankle, but in the last three or maybe four, they've gone to femoral. I understand what you said earlier, Judge Kleinfeld, about veins being hard to find, but I think if we look historically, why is there this shift all of a sudden? And, you know, one other point I want to mention is that – Do you happen to know, was there a change in personnel? I can easily imagine that if there was, the doctor would say, look, I want to make sure the guy is asleep and doesn't feel pain. I want the biggest vein I can get, and that's it. There may have been a change in personnel, but that's not what the protocol requires, and that's not what we negotiated in Dickens. Again, I want to remind the court that that was a core issue when Judge Wake had the party sit down and try and resolve their differences. And I think over time we did a pretty good job doing that, and there were a few issues left to litigate, but this was central for the plaintiffs in that matter. And then that is because of the extra pain, the unnecessary pain of the femoral procedure, as well as the ability of the public observers to watch the execution for signs of struggle or pain? Yes, Judge, and the fact that it's a very, very invasive procedure. You'd have less pain from the execution. The stick would be somewhat more painful because it's a bigger vein, but you would have less pain when the poisons to stop the heart and lungs were injected. It sounds to me, when you talk about invasive, as though what you're addressing is not the Eighth Amendment concern with the wanton infliction of unnecessary pain. It sounds as though you're concerned with the prisoner's modesty. Is that right? Well, you know, your statement about less pain or it happening quicker if it's in the femoral, I don't think there's anything in the record to show that. It's a bigger pipe. It's just like a bigger straw. Well, sure, but again, you know, this was something that the parties negotiated, and we went to the table in good faith, and ever since the state has reverted to going to the femoral. And this isn't about modesty. You know, the protocol requires that the sites be visible, whether it's peripheral or whether it's femoral, and that's another issue that we have with the protocol. Thank you. Do you have another means available for litigating whether or not the state is following its protocol? For Mr. West? Not just for Mr. West, in general. Well, there are other plaintiffs in the 1983 action that is still pending before Judge Wake. However, the state has moved to dismiss that lawsuit on 12B6 grounds, and Judge Wake has not yet ruled on it. And, again, one of the frustrations we have, as in, you know, we tried to litigate some of these issues in Cook, and we were dismissed out. Same thing with Beatty. And, you know, now Mr. West is put in a position where on the eve of execution, he's trying to litigate these claims. And, you know, over time, more and more information has come out, and we think, you know, we're at the tipping point here where, you know, the interests tip in favor of the prisoner. And we ask that this court enjoin the state from carrying out Mr. West's execution. All right. Does anybody else have any other panel members have any questions? Is there anything further that either of the attorneys wish to state? No. Your Honor, it's obvious to point out, but I just say that we're here on the eve of Mr. West's execution because that's when Mr. West has chosen to file this. He has known for weeks, as the district court order says, that this could have been filed weeks, if not a couple of months, almost two months ago when he knew that the barbital was going to be used in his execution. He was notified on May 25th. So we're here on the eve of his execution because this is when he's chosen to make his. But I urge this court to deny his motion to stay. Well, you know, I find that comment astounding. We got the information about Eric King on Saturday. We had a document dumped from the state. We requested those documents back in February, and we got those documents on Thursday evening. And, again, the problems with the executions in Alabama and Georgia are a very recent vintage. So, you know, when is the right time to file the lawsuit? You have to have enough information to meet your burden under Rule 8 and Rule 12B-6, and if you don't, the case is dismissed. So we feel that, based on the information we've presented, equity is tip in our favor. I just refer the court to Judge Wake's last paragraph in the order on page 14 about timing. I don't agree with Judge Wake on the timing point. I don't think there are very many statements that Judge Wake made in his order that are inaccurate. And, in fact, he's had to correct some since. So that's something that we have to decide. Do either of these panelists have any further questions or anything to add? I don't. Not me. All right. So this session of the court will be adjourned for today. Thank you. Thank you. Thank you. Judge Warnbaugh, will we call back or how will we handle that? Pardon me? Will we call back the conference? Let's call back. I don't want to be on the same line. All right. Should we use the same number? Good idea. I think we better use a different number. All right. So we'll wait for that information. We do have another number, and we should call in in the next couple minutes. All right. Thank you. All right. Great. Thanks. Thank you.
judges: Kleinfeld, Wardlaw, Callahan, Cjj